## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

HABIBOLLAH KERMANSHAH,    :

       Plaintiff,    :     CIVIL ACTION NO.: 08 CV 00409

          v.    :

ABBAS KERMANSHAH, ABDOLMAJID    :
KERMANSHAH, a/k/a/ MAJID
KERMANSHAH, ABDOLHAMID    :
KERMANSHAH, a/k/a HAMID
KERMANSHAH, 263 WEST 30TH INC.,    :
BANAFSH REALTY, INC., EBRAHIM
REALTY, INC., KERMANSHAH    :
BROTHERS ORIENTAL RUGS, INC.,
KERMANSHAH ORIENTAL RUGS, INC.,    :
KERMANSHAH BROTHERS RUGS, INC.,
OVERSEAS PARTNERSHIP CO., INC.,    :
OVERSEAS PARTNERSHIP COMPANY,
RAHMAN NY, INC., SHERIN WEST 86TH    :
STREET CORP., SHIREWIL, INC., and
WILSHIRE LIMITED,    :

       Defendants.    :

---------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

**Phillips Nizer LLP**
666 Fifth Avenue
New York, New York 10103-0074
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES................................................................... ii

PRELIMINARY STATEMENT..................................................……... 1

STATEMENT OF FACTS.................................................................. 4

LEGAL ARGUMENT........................................................................ 11

    **DEFENDANTS' MOTION TO DISMISS IS
WITHOUT MERIT AND SHOULD BE DENIED**.................................. 11

       a.    The Legal Standard for a Motion to Dismiss..................................... 11

       b.    Plaintiff's Amendment to the Complaint Resolves
            Any Statute of Limitations Issues..................…................................12

       c.    Plaintiff's Fraud-Based Claims Are Asserted Within
            The Applicable Statute of Limitations...........….............................18

       d.    The Statutes of Limitations Relating to Plaintiff's Claims
            for Breach of Contract, Oppression, Dissolution and for an
            Accounting Have Not Expired..................................................... 23

CONCLUSION.............................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Barris v. Hamilton*, 1999 WL 311813 (S.D.N.Y. 1999)................................................1, 2, 14

*Bolt Elec., Inc. v. City of New York*, 53 F.3d 465 (2d Cir. 1995) ...................................11

*Cialeo v. Mehlman*, 210 A.D.2d 67, 619 N.Y.S.2d 276 (1st Dept. 1994) ......................9

*Conley v. Gibson*, 355 U.S. 41 (1957) .........................................................................11

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .....................11

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) .............................................................11

*DeVito v. New York Cent. System*, 22 A.D.2d 600, 257 N.Y.S.2d 895 (1st Dep't 1965) ...............7

*Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, 747 F. Supp. 922 (S.D.N.Y. 1990)....................................................................................................5, 9

*Erbe v. Lincoln Rochester Trust Co.*, 3 N.Y.2d 321, 165 N.Y.S.2d 107 (1957) ............7

*Fromer v. Fromer*, 17 Misc.3d 1106( 851 N.Y.S.2d 58 (N.Y. Sup. 2007) ...................10

*General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 272 N.Y.S.2d 337 (1966)...............9

*Gleason v. Spota*, 194 A.D.2d 764, 599 N.Y.S.2d 297 (2nd Dep't 1993) ......................9

*In re Global Crossing Ltd. Securities Litigation*, 313 F.Supp.2d 189 (S.D.N.Y. 2003) ...........5, 6

*Harrison v. Rubenstein*, 2007 WL 582955 (S.D.N.Y. 2007) .....................................5, 7

*In re Integrated Resources Real Estate Limited Partnerships Securities Litig.*, 815 F.Supp. 620 (S.D.N.Y.1993)..........................................................................................1, 5

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dept. 2003).....................6

*Klein v. Spear, Leeds and Kellogg*, 309 F. Supp. 341 (S.D.N.Y. 1970).........................7

*Lieberthal v. Agency Ins. Brokers Inc.*, 216 A.D.2d 816, 628 N.Y.S.2d 885 (3rd Dept. 1995) ..................................................................................................................9

*Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387 (S.D.N.Y.1988)................................1

*Newman v. Warnaco Group, Inc.* 335 F.3d 187 (2d Cir. 2003)....................................5, 7

*Pavia v. 1120 Ave. of the Americas Associates*, 901 F. Supp. 620 (S.D.N.Y. 1995) .................5, 8

*Petrou v. Karl Ehmer Intern. Foods, Inc.*, 167 A.D.2d 338, 561 N.Y.S.2d 487 (2nd Dept. 1990) ...................................................................................................................................9

*Rizk v. Cohen*, 73 N.Y.2d 98, 538 N.Y.S.2d 229 (1989) ............................................................5, 9

*Sheppard v. Beerman,* 18 F.3d 147 (2d Cir. 1994) ......................................................................11

*Streit v. Bushnell*, 424 F. Supp. 2d 633 (S.D.N.Y. 2006) ..................................................2, 13, 14

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .....................................................................11

*Szajna v. Rand,* 131 A.D.2d 840, 517 N.Y.S.2d 201 (2nd Dept. 1987) .........................................9

*Tydings v. Greenfield, Stein & Senior, LLP,* 43 A.D.3d 680, 843 N.Y.S.2d 538 (1st Dept. 2007) ..................................................................................................................................10

*Wallace v. N.Y. Dept. of Corr.,* 1996 WL 586797 (E.D.N.Y. 1996) ...............................1, 2, 13, 14

*Weisl v. Polaris Holding Co.,* 226 A.D.2d 286, 641 N.Y.S.2d 288 (1st Dept. 1996) .................5, 9

## STATUTES

Fed.R.Civ.P. *12(b)(6)*...................................................................................................................11

## MISCELLANEOUS

*CPLR* 213(8)     ........................................................................................................................4, 5

1044887.TOA

## PRELIMINARY STATEMENT

Defendants, after paying for two senior lawyers to attend an informal conference with the magistrate before anything happened in this action, filed a comprehensive motion to dismiss that the court expressly cautioned defense counsel against filing. With the filing of an Amended Complaint, defense counsel assigned yet a third attorney to draft a brand new motion to dismiss containing completely new arguments. It bears remembering that all this exhaustive work, at unimaginable cost to the Defendants, comes before they filed an answer or engaged in any discovery. Defendants' tactics, while unconscionable on any level, are particularly egregious when the Court considers that the money being squandered by the Defendants is, without dispute, Plaintiff's money. It is not merely circumstance; Defendants hope that their expensive maneuverings will force Plaintiff to abandon his claims.

The disingenuous nature of Defendants' motion is disguised by a well-written colorful brief that offers unmistakable surface plausibility. But the cosmetic make-over is woefully insufficient to hide the undeniable truths of this matter:

- Defendants decry what they describe as the material changes in the Amended Complaint, as compared to the original complaint. Even a cursory reading of the two pleadings, however, reveals no inconsistencies. The Amended Complaint merely offers more detail and better elucidation of the facts. While the original complaint was more than sufficient to satisfy the standard imposed by law, the Defendants' intervening motion to dismiss required substantially more detail and clarity. As shall be demonstrated below, however, none of the statements is inconsistent or contradictory.

- Moreover, Plaintiff does not speak English and does not reside regularly in the United States. His original conversations with Plaintiff's counsel were designed to extract the minimal information necessary to draft a legally-sufficient pleading. Certainly, little focus was given to the minutia that seems to form the backbone of Defendants' motion. When faced with Defendants' motion to dismiss, Plaintiff and Plaintiff's counsel spent more time reviewing the underlying facts and focusing on the time-line demanded by Defendants. Perhaps some of the details were lost in translation. Certainly, federal law does not prejudice a party under these circumstances. (Declaration of N. Ari Weisbrot, Esq., ¶ 3).

- Defendants attach outside documents to their motion to dismiss. Are Defendants asking the Court to accept their extrinsic documentation as evidence to support their position that the "four corners" of the Amended Complaint are legally insufficient? Or, perhaps, this is Defendants' method for getting documents before the Court, while avoiding engaging in the very discovery that will undermine virtually everything they have put before the Court. In any event, it would appear that Defendants are now converting their motion to dismiss into a motion for summary judgment. Under these circumstances, where material questions of fact abound (including issues relating to the statutes of limitations), summary judgment is hardly appropriate.

1

- Consider the irony of this exchange: In his Complaint, Plaintiff alleges that he provided millions of dollars in capital to the Defendants over the years, in order to purchase and acquire the subject real estate properties and to sustain the brothers' rug businesses. In their first motion to dismiss, however, Defendants claim that "the court will learn that Plaintiff's claimed contributions to his brothers' business is completely false and, that, indeed, his brothers have supported Plaintiff and his children during his deeply troubled life." (Def. First Mem. of Law, p. 1). In response, Plaintiff offers the Court a sampling of numerous checks which unequivocally establish the substantial contributions made by Plaintiff to the Defendants' businesses over the years. (Exhibit A to the First Amended Complaint). Similarly, Plaintiff has provided the Court with a check that demonstrates the Plaintiff paid $170,000 of his own money to purchase one specific Property (Exhibit C to the First Amended Complaint), which the Defendants later surreptitiously transferred to their own corporate entity by forging Plaintiff's name on the deed. Moreover, Plaintiff offers the Court resolutions adopted by the Defendants over the years acknowledging the substantial financial contributions made by Plaintiff to Defendants. (Minutes of a Special Meeting of the Board of Directors of KBOR are attached as Exhibit E to the First Amended Complaint). Curiously, Defendants' second motion to dismiss omits the allegation that "the court will learn that Plaintiff's claimed contributions to his brothers' business is completely false and, that, indeed, his brothers have supported Plaintiff and his children during his deeply troubled life." Perhaps Defendants are finally conceding that all of their businesses and real estate properties were financed by Plaintiff. Perhaps not. It has little significance to this motion other than it demonstrates that in a short period of time adjustments are made to pleadings that change their meaning. It also demonstrates the length to which Defendants go to avoid answering for their fraud. Having been caught red-handed lying to the *Court*, it is hardly a stretch to imagine the extent of the fraud perpetrated on Plaintiff.

- Speaking of candor, the "facts" offered by Defendants in support of their motion to dismiss are absurd on their face. For example, Defendant Hamid Kermanshah submits an affidavit claiming that "I have never been known by any other name than ABDOLHAMID KERMANSHAH." This self-serving allegation is, of course, designed to support Defendants' assertion that the use of the name "Hamid" on the stock certificates must be forgeries. After all, Hamid does not use the name "Hamid." But, does not his attorney call him "Hamid" in his current motion to dismiss? In a New York State filing related to 263 West 30th Street, Inc., its C.E.O. is identified as "Hamid Kermanshah." (Weisbrot Decl., Exhibit B). So, which is it? Did Hamid submit a knowingly false affidavit when he said he does not use the name "Hamid?" Or did he lie to the Secretary of State of the State of New York when he used the named "Hamid"? Either way, the Court is reminded that the Defendants will say anything to avoid answering for their undisputed fraud.

- Moreover, even an amateur can see that "Hamid's" signature on the Minutes of the Board of Directors of KBOR (Amended Complaint, Exhibit E) matches perfectly "Hamid's" signature on the stock certificate. (Amended Complaint, Exhibit D). The same is true with a "publicly filed" Business Certificate for Partners of Overseas Partnership Company. (Weisbrot Decl., Exhibit C). Hamid's signature is identical to the stock certificate. Thus, although only a footnote in Defendants' memorandum of law, it seems patent that the Defendants lied to either the Saudi Arabian court or to this Court. Or both.

- Perhaps because he has not had the benefit of discovery, or perhaps because he is relying on his client's self-serving statements, defense counsel gets caught up in the misrepresentation. In his comments to the Court during the March 13, 2008 conference, he boldly tells the Court that Plaintiff "never had any interest in the buildings." (Declaration of F. Barbara Gluck Ried, Exhibit B, p. 11). Well, now we know the falsity of the statement. Plaintiff paid for the Monroe building outright and owned a lopsided 25% interest until it was diverted by Defendants. We know

2

Plaintiff holds stock certificates evidencing his ownership in 263 West 30th, Shirewil, Inc. (57 Fifth Avenue), and Wilshire Limited (59 Fifth Avenue). Thus, at this early stage of the proceeding, Plaintiff has demonstrated ownership of several of the buildings. In the face of the documentary evidence that is currently unchallenged before the Court, how does Defense counsel have the ability to assert, with such confidence, that Plaintiff "never had any interest in the buildings?" Had he made the statement after discovery or in a pleading, he would be subject to harsh sanction. Now, he can excuse the misrepresentation as an unfortunate mistake made without the benefit of discovery. So, at best, it was reckless. Perhaps, Defense counsel will excuse the mis-statement as having been made before he had the chance to fully investigate the facts and interview his clients. But, would that not be similar to Plaintiff's explanation for the minimalist (albeit legally sufficient) version of the original Complaint? Upon deeper investigation and inquiry, more comprehensive and detailed facts are typically included in the later pleadings.

- Bottom line? the Amended Complaint asserts, with ample support from the documentary record, that Defendants continued the fraud until, at the very earliest, early 2006 by the repeated misrepresentations regarding Plaintiff's ownership interests in the rug businesses and real properties. Regardless of the twisted math used in Defendants' motion papers, the fraud continued until well within the six (6) year statute of limitations for fraud claims. Moreover, regardless of when the actual fraud stopped, by continuing to make payments to Plaintiff and his family though 2006, Plaintiff had no reason to discover the fraud until the Saudi lawsuit compelled Plaintiff, in 2007, to audit his business interests. Defendants point to Plaintiff's allegations in the Saudi lawsuit that he was a partner in the New York businesses as evidence . . . well, it is unclear what Plaintiff's Saudi allegations prove. If anything, his insistence in the Saudi lawsuit that he is a partner in the American businesses merely confirms that he truly believed his brothers' affirmative representations, coupled with stock certificates and periodic payments, that he is a partner in the American businesses. If, on the other hand, Plaintiff asserted in the Saudi lawsuit that he was *not* a partner in the American businesses, perhaps the statement would support Defendants' claim that Plaintiff knew or reasonably should have known that he was *not* a partner. But, Defendants competently twist logic on its head by claiming that Plaintiff's claim in the Saudi lawsuit that he was his brothers' partner proves that he knew he was not their partner. Confused? That is precisely the point. In any event, the attachment of (selected) documents from a foreign lawsuit to disprove allegations of a Complaint are hardly sufficient basis to justify a pre-discovery motion to dismiss.

The fundamental fallacy lies in Defendants' distortion of the allegations of the Complaint. It is true that the Complaint does not allege any misconduct within the last six years. However, as the First Amended Complaint makes clear, Defendants actively and deliberately concealed their activities from Plaintiff. They forged documents (First Amended Complaint, Exhibit B), they consistently misrepresented their business operations (First Amended Complaint, ¶¶ 43-58), they issued stock certificates in Plaintiff's name (First Amended Complaint, Exhs. D, F, G). Indeed, until late 2006, the Defendant made payments to Plaintiff and his family, purportedly representing Plaintiff's "share" of the business. (First Amended Complaint, ¶¶ 43-58). Through late 2006, each individual defendant, Abbas, Majid and Hamid, on multiple occasions, confirmed Plaintiff's equal ownership interests in the rug

3

businesses and real properties. (Id.)  Defendants controlled the books and records of the corporate defendants and, therefore, were able to manipulate the information available to Plaintiff (and the state and federal governments).  Defendants, until at least 2005, filed and paid Plaintiff's personal taxes and his New Jersey property taxes, mortgage, maintenance, credit card bills. (First Amended Complaint, ¶ 49). These acts were not the Defendants' unselfish "support of Plaintiff during his deeply troubled life." Instead, they were presented to Plaintiff as his return on his now undisputable investment - - his share of the businesses.  Defendants, pursuant to their nefarious scheme, actively led Plaintiff to believe he was a partner in the businesses, both in word and in deed, thereby giving him no reason to know of Defendants' fraud.  Moreover, the deception and concealment continued through, at least, 2006 and was only discovered in 2007. (First Amended Complaint, ¶¶ 59-61).

## STATEMENT OF FACTS

### The Kermanshah Brothers' Rug Businesses

Plaintiff Habib and Defendants Abbas, Majid, and Hamid are brothers, born in Iran, but naturalized as United States' Citizens. (First Amended Complaint, ¶ 20).  In or about 1971, the two older brothers, Plaintiff Habib and Defendant Abbas opened "Kermanshah Rugs," a rug store in Tehran, Iran. By agreement, the meager profits generated were split evenly between Abbas and Habib.  (First Amended Complaint, ¶ 21).  Shortly after opening Kermanshah Rugs,  Abbas relocated to the United States and opened a Persian rug store, "Houbas Oriental Rugs," with funds taken from Kermanshah Rugs, jointly owned with Plaintiff.  By agreement, all expenses, costs, losses, revenue, profit, and income generated by Houbas, or its successor, "Kermanshah Brothers Oriental Rugs," ("KBOR") were spilt evenly between Abbas and Plaintiff. (First Amended Complaint, ¶ 22).

In or about 1978, Plaintiff Habib and Defendant Abbas relocated from Iran to Saudi Arabia, thereby expanding their business operations to include Saudi Arabia. Plaintiff and Abbas imported and sold Persian Rugs in Saudi Arabia and the United States.  The businesses were profitable and income from operations in the United States and Saudi Arabia were shared equally between Plaintiff and Abbas, who continued to support their younger brothers. (First Amended Complaint, ¶ 25). In the late 1970s and

4

early 1980s, younger brothers, Defendants Majid and Hamid immigrated to the United States and were given jobs running the brothers' New York business operations.   (First Amended Complaint, ¶ 26).

For the most part, the profit and income generated by Plaintiff Habib and Defendant Abbas in Saudi Arabia, a vast majority of which was generated by Habib, was sent to the United States to support Majid and Hamid. (First Amended Complaint, ¶ 27).

Thereafter, during the 1980s and 1990s, Plaintiff Habib sent a vast majority of his revenue and income to his brothers in the United States, who, in turn, used the money to invest in real estate in New York. (True copies of a sampling of Plaintiff's checks are collectively attached to the First Amended Complaint as Exhibit A). (First Amended Complaint, ¶ 29).

Notwithstanding the fact that a vast majority of funds used to acquire the New York real properties was supplied solely by Plaintiff, and little, if any, capital was contributed by Majid and Hamid, the four brothers agreed that any and all investments would be shared equally between the four brothers, Plaintiff Habib, and Defendants Abbas,  Majid, and Hamid, and each would have an equal ownership interest in all of the corporate entities organized for the purposes of acquiring the real estate properties. The brothers further agreed that all expenses, costs, revenue, income, and losses generated by the rug businesses and the real estate investments would be shared equally by the brothers. (First Amended Complaint, ¶ 30).

### The Real Estate Investments

During the late 1970s, 1980s, and 1990s, using mostly Plaintiff's money, and consistent with the brothers' agreement, Defendants Abbas, Majid, and Hamid formed various corporate entities, through which they acquired various real properties in New York City (collectively, the "Real Estate Properties"). (First Amended Complaint, ¶ 32).

In or about 1987, Plaintiff Habib and Defendants Abbas and Hamid, formed Overseas Partnership Company for the purposes of acquiring a residential building on real property located at 41 Monroe Street, New York, New York 10002.  Habib, Abbas, and Hamid were equal partners in the Partnership and, therefore, had an equal ownership in the Monroe Street building. (First Amended Complaint, ¶ 36).

In or about 2000, without obtaining Plaintiffs' permission or consent, Defendants Abbas, Majid, and Hamid, formed Overseas Partnership Co., Inc., a corporate entity deceptively formed with a name similar to the Partnership, but in which Plaintiff had no interest or rights, and transferred the Monroe Street property from the Partnership to the newly-formed corporate entity. In doing so, the Defendants forged Plaintiff's name on the deed and transfer documents. (A true copy of the forged deed is attached to the First Amended Complaint as Exhibit B). Plaintiff, however, much like the rest of the Real Estate Properties, provided the entire capital for the acquisition of the Monroe Street property, which has now been stolen by the Defendants. (A true copy of Plaintiff's payment check for the Monroe Street property is attached to the First Amended Complaint as Exhibit C). (First Amended Complaint, ¶ 37). Defendants signed Plaintiff's name on the Deed, as "Attorney in fact, said Power of Attorney is to be recorded simultaneously herewith." Plaintiff never executed a Power of Attorney authorizing the Defendants to execute a deed or transfer property on his behalf and, in any event, any limited, pre-existing Powers of Attorney had long expired. Indeed, on October 31, 2000, after the economy began a steady downturn, the brothers determined not to expand their businesses or acquire any additional property for the foreseeable future and, therefore, to the extent it was no longer necessary, Plaintiff sent a revocation of Power of Attorney to the Defendants, which was personally delivered on October 31, 2000 by Arc Messengers. (Plaintiff Aff., ¶ 2-3, Exhibit A). Three (3) months later, Defendants knowingly used the revoked power of attorney to steal the Monroe property. Unfortunately, Plaintiff had no way of knowing about the fraud until 2007 when he audited his investments. Prior to that, he had no reason to believe that the Defendants would forge his name on a deed to steal his property. The revocation of the POA had nothing to do with Plaintiff's relationship with his brothers or with any suspicions about their activities. In any event, the fact that the transfer documents were recorded with the City of New York is a red herring. Who checks the status of their real property for no reason? How often does a reasonable person visit the county clerk to check their deeds? As far as he knew, Plaintiff was receiving "rent" proceeds from the real properties through 2006. (Amended Complaint, ¶¶ 43-49, 56-58).

Defendants issued stock certificates to Plaintiff memorializing his ownership interests in some or

6

all of the Real Estate Properties. (True copies of Plaintiff's stick certificates are collectively attached to the First Amended Complaint as Exhibit D). (First Amended Complaint, ¶ 42).

**Defendants' Fraudulent Scheme**

After Plaintiff continued to fund the Defendants' operations and expenses, Abbas, Majid, and Hamid began a systematic fraudulent scheme to convert and deprive Plaintiff of his ownership interests in the various corporate entities, including the rug companies that he co-founded and built into successful companies. While it is unclear when the scheme began, it lasted until 2007 when Plaintiff finally discovered the Defendants' fraud. (First Amended Complaint, ¶ 44). Thus, Plaintiff much later learned that Abbas, Majid, and Hamid had falsely advised the Saudi royal family that Plaintiff has no interest in KBOR and did not speak for the company. (First Amended Complaint, ¶ 45).

Defendants controlled the books and records of the corporate defendants and, therefore, were able to manipulate the information available to Plaintiff. Throughout the relevant period, and as recently as late 2006, Abbas, Majid, and Hamid each represented to Plaintiff, on multiple occasions, that Plaintiff was an equal owner of the rug businesses and the Real Estate Properties. These representations occurred by telephone between each and all of the Defendants, on the one hand, and Plaintiff on the other hand, and in person in the Defendants' New York offices, and in Saudi Arabia between Abbas and Plaintiff, and in the brothers' lawyer's offices, and in written documents provided by each of the Defendants to Plaintiff. The representations occurred on a regular and frequent basis - - virtually every time the brothers communicated - - through late 2006. (First Amended Complaint, ¶ 46).

For example, in a conversation between the brothers at their New York offices, as recently as 2006, Majid and Hamid confirmed that any issues between Abbas and Plaintiff in Saudi Arabia had no relationship or impact on the brothers' American businesses, which were distinct and separate from Abbas and Plaintiff's Saudi operations. In that conversation, Majid and Hamid, again, confirmed Plaintiff's ownership interest in the rug businesses and Real Estate Properties. (First Amended Complaint, ¶ 47). Indeed, in a telephone conversation between Defendant Majid and members of Plaintiff's family in February 2008, Majid requested that Plaintiff withdraw this lawsuit and, once again, confirmed Plaintiff's

7

equal ownership of the rug businesses and Real Estate Properties but suggested that the businesses had been established with the intention of allowing the <u>four</u> brothers' children to benefit from the proceeds of the joint businesses. Thus, Defendants' false representations continued as recently as this year. (First Amended Complaint, ¶ 48).

In addition, until late 2006, the Defendants made payments to Plaintiff and his family, purportedly representing Plaintiff's "share" of the business. Defendants, until at least 2005, filed and paid Plaintiff's personal taxes and his New Jersey property taxes, mortgage, maintenance, credit card bills. These payments were presented to Plaintiff as his return on his investment - - his share of the businesses. (First Amended Complaint, ¶ 49).

Defendants, pursuant to their nefarious scheme, actively led Plaintiff to believe he was a partner in the businesses, both in word and in deed, thereby giving him no reason to know of Defendants' fraud. (First Amended Complaint, ¶ 50).

In fact, Abbas, Majid, and Hamid, in effect, either never registered Plaintiff's ownership interests in some or all of the corporate-entities or erased any evidence of Plaintiffs' ownership in some or all of the rug businesses and Real Estate Properties, including a notable "special meeting" of the board of directors of KBOR, wherein they acknowledged Plaintiff's "loans" to the Company. In exchange for the loans, Abbas, Majid, and Hamid, offered Plaintiff 160 of 200 shares in KBOR and, effectively, "eliminated" the brothers' substantial debt to Plaintiff. (A true copy of the minutes from the March 5, 1984 meeting of KBOR's board of directors is attached to the First Amended Complaint as Exhibit E. A true copy of Plaintiff's KBOR stock certificate is attached to the First Amended Complaint as Exhibit F). (First Amended Complaint, ¶ 51).

Almost immediately after fraudulently eliminating the debt to Plaintiff by offering him shares in KBOR, Abbas, Majid, and Hamid, founded a new corporate entity - - Kermanshah Oriental Rugs, Inc. ("KOR"), deliberately named in a manner to blur the relationship with KBOR - - and transferred all of KBOR's assets, business, funds, and operations from KBOR to KOR, thus leaving Plaintiff with 160 shares in a worthless company, and no valid debt to recover in exchange for his substantial investments in

8

and funding of the rug and real estate businesses in the United States. (First Amended Complaint, ¶ 52). Eventually, Abbas, Majid, and Hamid, issued a insignificant minority ownership interest in KOR to Plaintiff but represented to Plaintiff that his interest in KOR was intended to be combined with his interests in KBOR to equal his overall 25% interest in the combined rug businesses. (A true copy of Plaintiff's KOR stock certificate is attached to the First Amended Complaint as Exhibit G). Defendants did not advise Plaintiff, nor could he have known, however, that his interests in KBOR were rendered worthless by Defendants' fraud, leaving Plaintiff with an insignificant ownership interest in the overall rug businesses. Nevertheless, until, at least, late 2006, Defendants continued to point to the worthless stock certificate in KBOR as evidence of Plaintiff's equal ownership interests, while concealing the fact that they had, in fact, converted such interests. Shortly thereafter, the Defendants formed yet another entity, Kermanshah Brothers Rugs, Inc. ("KBR") designed to, once again, further erode Plaintiff's ownership interests in the rug businesses. (First Amended Complaint, ¶ 53).

Defendants' shell game has, in effect, left Plaintiff with an uncertain interest in the rug and real estate businesses for which he provided millions of dollars in funding and contributed most, if not all, of the sweat equity by building up the businesses, earning substantial revenue, and then sending that revenue to Abbas, Majid, and Hamid based on their agreement and promise to share all proceeds and profits from the rug businesses and Real Estate Properties. (First Amended Complaint, ¶ 54). Abbas, Majid, and Hamid fraudulently converted Plaintiffs ownership interests in the rug businesses and Real Estate Properties. (First Amended Complaint, ¶ 55).

Although initially, the Defendants forwarded one-time stock certificates, and periodic bank records, and other financial or business records to Plaintiff relating to the rug businesses, the practice of sharing occasional information and documentation ebbed in the mid-1990s. Nevertheless, the practice of updating Plaintiff as to the rug businesses and other investments and making repeated representations that Plaintiff was an equal owner of the rug businesses and Real Estate Properties continued until as recently as late 2006. (First Amended Complaint, ¶ 56).

Indeed, during Plaintiff's visits to the United States - - up to late 2006, Defendants regularly

9

showed Plaintiff the healthy inventory in the rug businesses and the occupied units in the Real Estate Properties, and re-affirmed Plaintiff's ownership interests in the businesses. (First Amended Complaint, ¶ 57). Thus, since the mid-1990s and through late 2006, Defendants had concealed their business activities from Plaintiff in which Plaintiff is, at the very least, a 25% owner. (First Amended Complaint, ¶ 58).

**Plaintiff's Discovery of Defendants' Misconduct**

Until the mid-2000s, Plaintiff had no knowledge, nor was there any reasonable basis for him to believe, that his brothers had excluded Plaintiff from his rightful ownership interests in the rug businesses or the Real Estate Properties. (First Amended Complaint, ¶ 59).

In or about 2006, Plaintiff discovered - - for the very first time, that Defendant Abbas had unlawfully diverted corporate assets from a joint account maintained in Saudi Arabia relating to the Saudi rug business of Plaintiff and Abbas. In addition, Plaintiff discovered that Defendant Abbas had been collecting Saudi receivables and depositing them into a personal account, to the exclusion of Plaintiff's rights. Thus, Plaintiff commenced a lawsuit in Saudi Arabia relating exclusively to the brothers' Saudi operations and finances. (First Amended Complaint, ¶ 60).

In or about 2007, in the course of litigating the Saudi Arabian lawsuit against Defendant Abbas, relating solely to Plaintiff's and Abbas's Saudi business, Plaintiff began to audit all of this business interests, including those in the United States. In the process, Plaintiff reviewed public documents relating to the rug businesses and real properties but even those documents do not disclose membership interests, ownership shares, or any of the elements that might shed light on Defendants' wrongdoing. Plaintiff did, however, discover that in 2001, Defendants had forged Plaintiffs name on a deed transferring one of the Real Estate Properties from an entity in which he held an ownership interest to an entity in which he did not own a membership interest. (First Amended Complaint, Exhibit B). This revelation, in 2007, was the first time that Plaintiff had any reason to believe that the Defendants had taken steps to divert his ownership interests in the American rug businesses and New York Real Estate Properties that he had financed. Although most of the documentation evidencing the fraud is in defendants' exclusive possession, the documents that were recovered gave rise to Plaintiff's reasonable

10

suspicion that the Defendants have defrauded Plaintiff and breached their agreement to jointly own the rug businesses and Real Estate Properties. (First Amended Complaint, ¶ 61).

## LEGAL ARGUMENT

### DEFENDANTS' MOTION TO DISMISS IS WITHOUT MERIT AND SHOULD BE DENIED

a.    The Legal Standard for a Motion to Dismiss

On a motion to dismiss under Fed.R.Civ.P. *12(b)(6)* "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir. 1995). For purposes of a motion to dismiss, a "complaint" is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, *see Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989), and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991). A complaint should not be dismissed on the pleadings unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), the United States Supreme Court emphasized that at the pleading stage a plaintiff must meet no more rigorous a burden than that found in Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See id.* at 512. *Swierkiewicz* is, without question, a potent reminder of a plaintiff's pleading burden. A complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 513 (quoting *Conley v. Gibson,* 355 U.S. 41 (1957)). Dismissal is improper on technical pleading irregularities, which are excusable "as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party." *Id.*

1044887.1

Here, it is not disputed, nor do Defendants assert, that the Amended Complaint asserts viable and sustainable causes of action. Instead, the Defendants merely assert that any such claims are time-barred by operation of the Statute of Limitations. Clearly, this assertion is frivolous on its face. Putting aside the many false statements thrown in Defendants' motion for good measure, the fact remains that Plaintiff claims - - with ample support from the record - - that he did not know of Defendants' misconduct until, the earliest, 2007. (First Amended Complaint ¶¶ 59-61). The only question, therefore, before the Court is whether Plaintiff reasonably should have known of the fraud more than six (6) years ago. As set forth below, at a minimum, the inquiry of whether Plaintiff "should have known" is a question of fact that can not be decided on a motion to dismiss or even a motion for summary judgment. Moreover, the overwhelming and, as yet undisputed, evidence at this early stage, demonstrates the extent to which Defendants went to conceal their fraud and "cover their tracks." It is black-letter law in this District and in the state of New York that such concealment, by itself, operates to toll any applicable statutes of limitation.

b.    Plaintiff's Amendment to the Complaint Resolves Any Statute of Limitations Issues

At the heart of Defendants' renewed motion to dismiss, is their assertion that "inconsistencies" and "contradictions" between the original complaint and the Amended Complaint require the Court to disregard the factual allegations of the Amended Complaint, determine, as a matter of law and fact, that Plaintiff's amended allegations are false and incredible, and conclude that the entire lawsuit should be dismissed, before any discovery is exchanged. Defendants have expended a small fortune in connection with the multiple attorneys, various court conferences, and two completely different motions to dismiss. Clearly, the statute of limitations defense is available in the course of discovery and, by any standard, would either be a stronger motion once the relevant facts are discovered or would be mooted (thus saving a lot of money).   So, of course, the question remains, why, in the face of the Court's well-intentioned advice to postpone the motion to dismiss, have the Defendants exhausted so much time and money filing not one, but two motions? To determine the answer, a brief review of the most salient facts is in order: it is beyond any dispute that Plaintiff provided most, if not all, of the underlying capital used by the

12

Defendants to acquire the real properties and finance the rug businesses. (Amended Complaint, Exhibits A, C, E)  The cashed checks from Plaintiff's account, board of director's meeting minutes, and stock certificates are fairly unambiguous in that regard.  It is also undisputed that notwithstanding the capital provided by Plaintiff, the Defendants have taken the position that Plaintiff has no ownership interests in the businesses and is not entitled to any return on his substantial investments. (See Defendants' motion papers). It is also undisputed that through 2006, the Defendants continuously took steps to conceal their fraud by giving Plaintiff money, paying some of his bills, making false representations about his ownership interests, and offering him tours of "his holdings" during visits to New York. (Amended Complaint. ¶¶ 44-49).  If this matter is dismissed, the Defendants are home free. They will have successfully diverted and misappropriated Plaintiff's capital investment valued in the millions of dollars. On the other hand, if the Defendants are subject to discovery, their fraud will be revealed in short order. Thus, Defendants will stop at nothing to avoid filing an answer or engaging in discovery.

Defendants argue, therefore, as follows: "Where a Plaintiff blatantly amends his statement of facts to respond to a motion to dismiss and directly contradicts allegations set forth in the original complaint, the Court should accept the facts as described in the original, not the amended, complaint, when ruling on a motion to dismiss." (Def. Mem. of Law, p. 12).  In support of that proposition, Defendants cite *Wallace v. N.Y. Dept. of Corr.*, 1996 WL 586797 (E.D.N.Y. 1996).  Defendants also acknowledge a Southern District case that declined to follow *Wallace* because "the amended complaint simply modified some aspects of the pleading." *Streit v. Bushnell,* 424 F. Supp. 2d 633, 640 (S.D.N.Y. 2006). Those are the only cases offered by Defendants for the proposition that the Court should disregard the allegations of the Amended Complaint and dismiss the original Complaint.  Obviously, if the Court rejects this argument, there is no basis to dismiss the Amended Complaint; Defendants offer only token challenges to its self-sufficiency.  Indeed, the Amended Complaint, the allegations of which must be accepted as true for the purposes of this motion, sets forth that Plaintiff only learned of the fraud in 2007 and that the Defendants took affirmative steps to conceal the fraud through, at least 2006 - - both well within the applicable statutes of limitation.

13

The law offered by Defendants, however, seems awfully thin - - one case, *Wallace*, from outside this District and from 12 years ago, where a blatantly contradictory amended pleading was dismissed on a pre-pleading motion and a second case, *Streit*, from last year and from *this* district, where a similar motion to dismiss was denied. Perhaps defense counsel was accurate when he disclosed to the Court during the May 2 telephone conference that "I looked at the law on this. I could only find a couple of cases, one in the Eastern District and one in the Southern District. . . So, that's all we have been able to find on the law in this area." (Weisbrot Decl., Exh. A, pp. 2-3).

But, surprisingly, despite all the hard work of at least three extremely competent defense lawyers, they were unable to locate the Southern District Case that actually articulates the relevant standard for precisely this situation. In *Barris v. Hamilton,* 1999 WL 311813 (S.D.N.Y. 1999), this Court held, without ambiguity, that:

> Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible, not conclusive, admissions. **It is well-established in the Second Circuit that superseded pleadings, while not judicial admissions per se, may be introduced as evidence and considered an admission. While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the fact finder to consider the earlier pleadings as admissions in due course.** In light of the above considerations, the Court shall rely on Plaintiff's Amended Complaint in considering Defendants' Motion to Dismiss.

(*Id.* p. 2, Emphasis added).

*Barris*, in other words, takes *Wallace* and undercuts its conclusions by banishing them, at least in the Southern District, to "rare occasion." This is the sort of "negative" history that should, indeed, *must*, be brought to the attention of the Court if *Wallace* is to be cited by the Defendants. Particularly since it offers a "general rule" to be followed by this court under the same or similar circumstances.

Nevertheless, giving defense counsel every benefit of the doubt, perhaps the omission was unintentional. Perhaps, as expressed by one of the two defense attorneys participating in the telephone conference, "that's all we have been able to find on the law in this area." (Weisbrot Decl., Exh. A, pp. 2-

14

3). But, wait. A review of the transcript of the telephone conference reveals the following statement by

Defense counsel:

> I could only find a couple of cases, one in the Eastern District and one in the
> Southern District. The one in the Eastern District which was a decision by Judge
> Johnson, a case called *Wallace*. . . The other decision which is by Judge Batts
> says, well, that was a case where you had that sequence, where you had the motion
> to dismiss and then an amended complaint. In the case that she had before her
> **which is called *Barris*,** she came to the other conclusion, which is that she would
> deal with the amended complaint, and then she wound up dismissing the case
> anyway.

(Weisbrot Decl., Exh. A, pp. 2-3, emphasis added).

So, in fact, defense counsel knew about *Barris* but decided to omit it from their motion papers.

Perhaps Defendants also missed *Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 395 (S.D.N.Y.1988);

another Southern District case that held dismissal of allegedly contradictory, amended pleadings

unwarranted. (Although *Limited* was cited in *Barris*). Defendants will undoubtedly distinguish *Barris*

and its progeny by claiming that in those cases the amended pleading was filed *before* the motion to

dismiss, unlike the instant matter and *Wallace* in which the amended pleading was filed *after* the motion

to dismiss. But, that claim needs to be carefully scrutinized because the Court in *Barris* pointed out that

the pleading was amended "*before* the return date" of Defendant's motion to dismiss and "Defendants

were therefore able to address the allegations of the amended pleadings in their motions." (*Barris*, at p. 2,

emphasis added). That is precisely what occurred in the instant matter.    Plaintiff's amended Complaint

was filed *before* the return date of Defendants' first motion to dismiss and Defendants have, therefore,

been able to address the allegations of the amended pleadings in their motion. Even if the circumstances

are distinguishable, which the Defendants will presumably attempt to argue, the line of cases should have

been cited for the "general rule" in this District.

In any event, there are at least two very recent Southern District cases that conclude that an

amended complaint - - even with inconsistent allegations  - - should not be dismissed, while there are *no*

Southern District cases where an amended pleading was dismissed  - - even in the face of contradictory

allegations of fact.

15

But, perhaps an examination of the "contradictions" asserted by Defendants is appropriate notwithstanding the "general rule."

On page 7 of their memorandum of law, Defendants point out that in the original Complaint, Plaintiff asserted that the Defendants "refused to account to Plaintiff or to provide Plaintiff with any information or documentation relating to the rug business or the Real Estate Properties." (Comp. ¶ 45). In the Amended Complaint, that paragraph was replaced with the following allegation: "Indeed, during Plaintiff's visits to the United States - - up to late 2006, Defendants regularly showed Plaintiff the healthy inventory in the rug business and the occupied units in the Real Estate Properties, and reaffirmed Plaintiff's ownership interests in the businesses." (Amended Complaint, ¶ 57).

Where is the "contradiction?" In fact, both are true. First of all, the original allegation contained no dates and, in fact, at least that particular paragraph was designed to summarize the overall fraud in its current state. The subsequent paragraphs are also not time-specific but, instead, concluding remarks highlighting the misconduct.    In any case, affirmatively refusing to providing information and documentation is not inconsistent with showing rugs and making affirmative assurances that the units are occupied.  How does showing rugs and making vague assurances about occupancy rate contradict a failure to provide specific information and documentation?  The question answers itself.  Certainly, with the minimal standard required for a pleading, the original complaint was sufficient to offer Defendants notice of the nature of Plaintiff's allegations.  When pressed, Plaintiff offered more detail.   Is this the "blatant changing" of the statement of facts akin to *Wallace* (which is not even precedential in this District)?  Or is it the simple "modification" of some aspects of the pleading, akin to *Barris* and *Streit* (which are controlling in this case)?

The same is true for Defendants' next example (Def. Mem. of Law, p. 8).  In paragraph 52 of the original Complaint, Plaintiff asserted that "since the mid-1990s, Defendants had concealed their business activities from Plaintiff and ceased providing Plaintiff with any information or documentation relating to the brothers' business activities."  In the Amended Complaint, Plaintiff deleted the words "and ceased providing Plaintiff with any information or documentation relating to the brothers' business activities."

16

Again, where is the "contradiction" or "inconsistency?"  Plaintiff continues to maintain that the Defendants did not provide any documentation or information after the 1990s. That fact has not changed. In their original motion, however, Defendants disingenuously seized upon that allegation as evidence that something "changed" in the mid-1990 to offer Plaintiff inquiry notice of the fraud.  In reality, the intent of the allegation was that during the 1970-1990s, Defendants issued to Plaintiff stock certificates and related documentation.   The information was sparse and infrequent and, in any case, by its nature would not be perpetual or regular. (How often does one receive stock certificates for the same ownership interest?) Moreover, any written documentation was replaced by oral assurances and representations – through 2006. But, to be sure, no further stock certificates or related documentation was forwarded after the mid-1990s.   And no reasonable person would have expected further stock certificates. Moreover, the allegation of original paragraph 52 related only to the rug businesses.  Plaintiff *never* received written documentation or detailed information about the Real Estate Properties.   But, by attaching twisted significance to the allegation, Defendants were, typically, distorting the plain meaning of the original Complaint.  The amendment did not contradict the original Complaint; it clarified it and offered more detail and background.

The same is true for 4 of the 6 "inconsistencies" cited by Defendants on pages 7-8 of their memorandum of law, which in fact are all the very same allegations taken from different areas of the Complaint. The other two examples relate to the sharing of revenue. The original complaint asserted that the Defendants failed to share any revenue, profit, or proceeds from the businesses with Plaintiff.  In fact, as set forth in the Amended Complaint, Defendants made payments to Plaintiff and his family though 2006 and led Plaintiff to believe these payments represented his share of the profits.  These payments however, were not profit sharing, or a return on Plaintiff's investment.  They were sham payments representing a fraction of Plaintiff's share of the businesses and were designed to lead Plaintiff down the "garden path" and not arouse his suspicions.  Thus, the payments made through 2006 were not, in fact, profit or revenue from the businesses, as set forth in the Complaint, but there were designed to defraud the Plaintiff, as set forth in the Amended Complaint. Both are true.  But, to avoid the sort of manipulations

17

favored by Defendants, the allegations were modified and clarified in the Amended Complaint. There is simply nothing "contradictory" about alleging, in one instance, that the Defendants failed to share profits, and in the second instance, that the Defendants made "sham" payments to the Plaintiff to lead him to believe his ownership interest were secure.

c.    Plaintiff's Fraud-Based Claims Are Asserted within the Applicable Statute of Limitations

It is clear that the gravaman of Plaintiff's claims against the Defendants sound in fraud and misrepresentation. The Defendants fraudulently induced Plaintiff to send them millions of dollars on the promise that he would be an equal partner and owner in the rug businesses and Real Estate Properties. Nevertheless, the Defendants fraudulently formed corporate entities to acquire the Real Estate Properties and conduct the rug businesses to the deliberate exclusion of Plaintiff's ownership rights. The Defendants forged Plaintiff's name on a deed to effectuate the transfer of real property from an entity in which Plaintiff was an owner to an entity in which he had no ownership interests. The Defendants repeatedly made knowingly false statements, promises, and representations to Plaintiff to conceal their fraud and misconduct.

Pursuant to well-established New York law, an action based upon fraud must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it. *CPLR* 213(8).

To a large degree, the fraud at the heart of Plaintiff's claim occurred within the last six (6) years and, therefore, well within the statute of limitations. Nonetheless, to the extent that the fraudulent conduct occurred prior to six (6) years ago, New York law tolls any limintation period until the Plaintiff actually knew or could with reasonable diligence have discovered the fraud. The actual timing of the fraud is irrelevant. Thus, oft-repeated statements by Defendants in their motion papers that there is not a single allegation of anything occurring after January 2002 are nothing more than a red-herring and, despite the rhetoric, are meaningless to the issues currently before the Court. (Def. Mem. of Law, p. 18). Nothing had to have happened *after* January 2002, as long as earlier events were concealed from Plaintiff.

18

Where fraud is the basis of the action, the language of the limitations statute itself provides that the action will not accrue, and the statute will not begin to run until the fraud giving rise to the action is discovered or could have been discovered with reasonable diligence. *CPLR* 213(8). **Even where fraud is not the basis of the action**, fraudulent concealment by the wrongdoer after the accrual of a cause of action, for the purpose of concealing the wrongdoing, may be cause to toll the statute of limitations, sometimes referred to in terms of extending the accrual of the claim or as a form of equitable estoppel. *See, Rizk v. Cohen*, 73 N.Y.2d 98, 538 N.Y.S.2d 229 (1989); *Weisl v. Polaris Holding Co.*, 226 A.D.2d 286, 641 N.Y.S.2d 288 (1st Dept. 1996).

This Court has distinguished the doctrine of equitable tolling by fraudulent concealment from the doctrine of equitable estoppel. *Pavia v. 1120 Ave. of the Americas Associates*, 901 F. Supp. 620 (S.D.N.Y. 1995) (fraudulent concealment applies where the defendant fraudulently concealed the existence of the cause of action; equitable estoppel applies where it is the defendant's affirmative wrongdoing that results in the long delay between the accrual of the cause of action and the institution of the legal proceeding); *see also Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, 747 F. Supp. 922 (S.D.N.Y. 1990).

In *Harrison v. Rubenstein*, 2007 WL 582955 (S.D.N.Y. 2007), Plaintiff asserted that he diligently investigated the possibility that he was the victim of securities fraud but that he could not confirm the fraud until years after it occurred. In denying Defendants' motion to dismiss based upon the applicable statute of limitations, this Court concluded that the standard to be applied is whether some fraud was "probable, not merely possible." *Quoting Newman v. Warnaco Group, Inc.* 335 F.3d 187, 193 (2d Cir. 2003). Further, the court held,

> since Plaintiffs claim to have exercised diligence after their duty of inquiry arose, it is inappropriate at this stage for the Court to determine at what point after January 26, 2001 they should reasonably have known of the fraud they allege. *See In re Integrated Resources Real Estate Limited Partnerships Securities Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993) (holding that the question of whether a plaintiff reasonably exercised due diligence after being placed on inquiry notice of securities fraud is "usually a question of fact for the jury to decide"); *In re Global Crossing Ltd. Securities Litigation*, 313 F.Supp.2d 189, 204 (S.D.N.Y.

> 2003) ("it is a question of fact for ultimate resolution at trial (or on summary
> judgment if the factual record permits only one conclusion) whether plaintiffs in
> the exercise of reasonable diligence would have discovered the facts underlying
> the present claim more than one year before those claims were asserted").

Here, the Defendant's fraud occurred up to and including late 2006. Defendants continued to make oral representations and assurances relating to Plaintiff's ownership interests through late 2006 and as recently as after this lawsuit was initiated; continued to provide Plaintiff with revenue and alleged "profit" from his investments through late 2006; continued to provide oral updates on the businesses through 2006; and continued to pay Plaintiff's personal taxes and his New Jersey property taxes, mortgage, maintenance, and credit card bills through at least 2005. Thus, the statute of limitations clearly does not preclude Plaintiff's claims that arose less than two years ago.

However, even if the fraud occurred more than six (6) years ago, Plaintiff's complaint is timely because: (1) he only learned of the fraud in 2007; (2) he had no reason to suspect or learn of the fraud until, at the earliest 2006, (3) Plaintiff was ignorant of the cause of action because of the defendants' fraudulent concealment and (4) the defendant's conduct caused the plaintiff to delay in bringing suit.

As a threshold matter, the question of whether Plaintiff reasonably exercised due diligence after being placed on inquiry notice of the Defendants' fraud is "usually a question of fact for the jury to decide." *See, In re Global Crossing Ltd. Securities Litigation,* 313 F.Supp.2d 189, 204 (S.D.N.Y. 2003);

Significantly, in a recent decision, *Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dept. 2003), the Appellate Division, First Department, reversed a trial court's dismissal of a complaint on statute of limitations grounds, and held that

> In view of plaintiffs' submissions, it was error for the IAS court to rule as a
> matter of law that they could have, with reasonable diligence, discovered the
> fraud in 1994. A clear question of fact exists as to whether plaintiffs could
> reasonably have inferred from the April 1994 letter, or from public documents
> relating to the foreclosure sale, that a fraud was perpetrated upon them (*id.*).
> Accordingly, defendants' motion to dismiss the fraud and breach of fiduciary
> duty claims as time-barred should have been denied.

*Id.* at 123.

20

Thus, at this early stage, the Court must deny Defendants' motion to dismiss because the single issue - - Plaintiff's constructive notice of the Defendants' fraud - - is a question of fact to be determined by a jury.

Moreover, the weight of the evidence militates against a finding by the Court (or a jury) that Plaintiff was on inquiry notice of Defendants' misconduct. In an action for actual fraud, the discovery that gives rise to accrual of the action for limitations purposes must be discovery of the facts constituting the fraud itself and not those merely constituting evidence of them. *DeVito v. New York Cent. System,* 22 A.D.2d 600, 257 N.Y.S.2d 895 (1st Dep't 1965). Knowledge of the fraudulent act is thus required, and mere suspicions will not constitute a sufficient substitute, *Erbe v. Lincoln Rochester Trust Co.,* 3 N.Y.2d 321, 165 N.Y.S.2d 107 (1957). *See also Klein v. Spear, Leeds and Kellogg,* 309 F. Supp. 341 (S.D.N.Y. 1970) (applying New York law; holding that the plaintiff need only show that he remained in ignorance of the fraud without any fault or want of due diligence or care on his part). The standard to be applied is whether some fraud was "probable, not merely possible." *Harrison v. Rubenstein,* 2007 WL 582955 (S.D.N.Y. 2007), q*uoting Newman v. Warnaco Group, Inc.* 335 F.3d 187, 193 (2d Cir. 2003).

Here, Defendants' motion is based entirely upon Plaintiff's assertion that Defendants stopped sending certain limited documents relating to the rug businesses in the mid-1990s. Clearly, on balance, the ebb in flow of *documentary* information - - information that, by its nature, was never significant with respect to the rug businesses, and was never-existent with respect to the Real Estate Properties, can hardly be said to put Plaintiff on notice that "fraud was probable, not merely possible." What facts were "discovered" by Plaintiff in the 1990s? Is there any indication that Plaintiff had knowledge of the "fraudulent acts" prior to 2007? Quite the opposite: there were not even reasonable suspicions (which, by themselves would not accrue the limitations period) . In the other hand, until <u>late 2006,</u> the Defendant made payments to Plaintiff and his family, purportedly representing Plaintiff's "share" of the business. Through late 2006, each individual defendant, on multiple occasions, confirmed equal ownership interests in the rug businesses and real properties. Defendants controlled the books and records of the corporate defendants and, therefore, were able to manipulate the information available to Plaintiff. Defendants,

21

until at least 2005, filed and paid Plaintiff's personal taxes and his New Jersey property taxes, mortgage, maintenance, credit card bills. Visits to New York were met with a "horse and pony show" designed to deceive Plaintiff. As Defendants point out - - even as late as the very end of 2005, Plaintiff accepted his brothers' representations that he was a partner in the American businesses - - he included it as an aside it in his counterclaim in the Saudi lawsuit - - which had nothing to do with the American Businesses. Certainly, it cannot be said that Plaintiff was on inquiry notice before January 2006 under these circumstances.

Defendants' motion takes a simplistic, inaccurate approach to privately held companies. For example, Defendants demand that Plaintiff, over the years, should have obtained publicly available information that would have revealed the alleged frauds. (Def. Mem. of Law, p. 21-22). But, is that true? Of course not. Nothing available to the public would indicate that Plaintiff had been deprived of his ownership interests in the rug businesses or Real Estate Properties. These documents do not identify the members or shareholders of the entities that acquired the Real Estate Properties. In other words, for example, had Plaintiff inquired into the publicly available information about 97 Perry Street, he would have discovered that the Property is owned by Defendant Ebrahim Realty, Inc. and that it was acquired on December 27, 1993, by deed made to Ebrahim. Of what fraud would that have put him on notice? Particularly, when the Court considers that Defendants – as recently as late 2006 - - advised Plaintiff that he was an equal owner in the entities that acquired the Real Estate Properties and was given money purportedly representing income generated by the properties. Defendants' motion has surface appeal but lacks any logical substance. The issue is not whether Plaintiff inquired of publicly available documents but, rather, whether he had reason to. Here, Plaintiff was receiving income from his investments as recently as late 2006. He was repeatedly reassured by all the defendants that his ownership interests in all the properties and businesses were intact.

Moreover, it is hornbook law in New York that the statute of limitations is tolled where the Defendants fraudulently concealed the existence of the cause of action or where the plaintiff is ignorant of the cause of action because of the defendant's fraudulent concealment. *See Pavia v. 1120 Ave. of the*

22

*Americas Associates,* 901 F. Supp. 620 (S.D.N.Y. 1995); *Department of Economic Development v. Arthur Andersen & Co. (U.S.A.),* 747 F. Supp. 922 (S.D.N.Y. 1990); *Petrou v. Karl Ehmer Intern. Foods, Inc.,* 167 A.D.2d 338, 561 N.Y.S.2d 487 (2nd Dept. 1990)

Similarly, to the extent they arise from Defendants' fraud, Plaintiff's claims for declaratory judgment, breach of fiduciary duty, breach of contract, conversion, and unjust enrichment are all timely as a matter of law. A party cannot steal someone's property, take affirmative steps to conceal the theft for the duration of the limitations period, and then escape liability as a result of the victim's inability to uncover the conversion during the statutory time period. In the same vein, every day within the last six years, Defendants have recovered rents and other income form the real properties, a portion of which belongs to Plaintiff. By failing to turn these funds over, Defendants have been unjustly enriched at Plaintiff's expense over the relevant period, including within the last 6 years!

d.    The Statutes of Limitations relating to Plaintiff's Claims for Breach
       of Contract, Oppression, Dissolution  and for an Accounting have not Expired

As the courts of this state have repeatedly held, even where fraud is not the basis of the action, fraudulent concealment by the wrongdoer after the accrual of a cause of action, for the purpose of concealing the wrongdoing, may be cause to toll the statute of limitations, sometimes referred to in terms of extending the accrual of the claim or as a form of equitable estoppel. *See, Rizk v. Cohen,* 73 N.Y.2d 98, 538 N.Y.S.2d 229 (1989); *Weisl v. Polaris Holding Co.,* 226 A.D.2d 286, 641 N.Y.S.2d 288 (1st Dept. 1996); *Lieberthal v. Agency Ins. Brokers Inc.,* 216 A.D.2d 816, 628 N.Y.S.2d 885 (3rd Dept. 1995); *Szajna v. Rand,* 131 A.D.2d 840, 517 N.Y.S.2d 201 (2nd Dept. 1987); *Cialeo v. Mehlman,* 210 A.D.2d 67, 619 N.Y.S.2d 276 (1st Dept. 1994); *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 272 N.Y.S.2d 337 (1966); *Gleason v. Spota,* 194 A.D.2d 764, 599 N.Y.S.2d 297 (2nd Dep't 1993).

It is patent that Plaintiff has demonstrated an irrefutable claim of minority ownership in some of the Defendant entities. The stock certificates and corporate resolutions are *prima facie* evidence of Plaintiff's ongoing ownership interests in, at least some, of the entities, and tend to support Plaintiff's claims of ownership to all of the rug businesses and real properties. The documents supporting the

23

balance of the businesses are exclusively in Defendants' possession and, once discovered, will likely give rise to irrefutable support for all of Plaintiff's claims.

As a shareholder in the corporate defendants, and as a partner in Overseas Partnership Co., which formerly owned the real property located 41 Monroe Street, New York, New York, until Defendants forged Plaintiff's name on the deed, Plaintiff has an absolute right to an accounting of the partnership books and records and of his ownership interests in the corporate entities. *See*, for example, New York Partnership Law § 74 and B.C.L. § 624.

Under New York law, an action for an accounting is governed by a six-year statute of limitations and accrues when the duty to pay arises. *Fromer v. Fromer*, 17 Misc.3d 1106(A), 851 N.Y.S.2d 58 (N.Y. Sup. 2007) *Tydings v. Greenfield, Stein & Senior, LLP*, 43 A.D.3d 680, 843 N.Y.S.2d 538 (1st Dept. 2007) ("claims such as those at issue here accrue when there is either an open repudiation of the fiduciary's obligation or a judicial settlement of the fiduciary's account").

More importantly, it is obvious that, even if Plaintiff's claims for an accounting are subject to a statute of limitations, he is still entitled to an accounting for the last six (6) year period undisputedly within the statute of limitations.

Similarly, Plaintiff's claims for oppression and dissolution cannot possibly, under any theory, be subject to an expired six (6) year limitation period. Perhaps a minority shareholder can be precluded from pursuing oppression claims relating to acts that occurred six (6) years earlier and of which they knew or should have known. In that case, there may be a waiver of such claims. But, what if, for example, a minority shareholder is subject to a small act of oppression and fails to pursue a claim for 10 years. Subsequently, the minority shareholder is subject to unrelated, more severe acts of oppression. Can it seriously be said that the claim for the second acts of oppression is some how time-barred because no action was taken with respect to the earlier act of oppression? Is a minority shareholder who overlooks an act of oppression at one point, forever required to accept any and all future acts of oppression? Clearly not.

Here, Plaintiff is, today, undisputedly a minority shareholder in, at least, 263 West 30th Inc.,

KBOR, KOR, Overseas, Shirewel, and Wilshire. He is also a minority shareholder in the balance of the

corporate-defendants, but those documents will be subject to discovery from the Defendants in the course

of this action.  In any event, as a minority shareholder, the Plaintiff has certain valuable rights and, since

late 2006, he has received no income, profit, or revenue from the corporate-entities; he has received no

accounting, nor access to information, he has been frozen out of any corporate decision making and, as

discovered last year, his ownership interests are being diverted and converted by the Defendants. These

acts of oppression either began within the last 2 years (failure to share in profits and income; failure to

share information) or were only discovered last year (forgery of corporate documents, and failure to

register Plaintiff's interests).

Finally, and by the same token, Defendants have breached their agreement with Plaintiff to

equally share in the profits, revenue, and income of the Defendant-entities.  These breaches occurred

within the last six (6) years and, depending on what the accounting discloses, may have only begun in

2006! The cause of action is certainly timely as a matter of law.

## CONCLUSION

For the foregoing reasons, and based upon the facts and legal authority provided, it is respectfully

submitted that Defendants' motion to dismiss should be denied in its entirety.

Dated: New York, New York
       May 21 , 2008

**PHILLIPS NIZER LLP**

By: _____
    N. Ari Weisbrot

    666 Fifth Avenue
    New York, New York 10103-0074
    (212) 977-9700
    *aweisbrot@phillipsnizer.com*

    *Attorneys for Plaintiff*

25

1044887.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HABIBOLLAH KERMANSHAH,<br><br>Plaintiff,<br><br>v.<br><br>ABBAS KERMANSHAH, ABDOLMAJID KERMANSHAH, a/k/a MAJID KERMANSHAH, ABDOLHAMID KERMANSHAH, a/k/a HAMID KERMANSHAH, 263 WEST 30TH INC., BANAFSH REALTY, INC., EBRAHIM REALTY, INC., KERMANSHAH BROTHERS ORIENTAL RUGS, INC., KERMANSHAH ORIENTAL RUGS, INC., KERMANSHAH BROTHERS RUGS, INC., OVERSEAS PARTNERSHIP CO., INC., OVERSEAS PARTNERSHIP COMPANY, RAHMAN NY, INC., SHERIN WEST 86TH STREET CORP., SHIREWIL, INC., and WILSHIRE LIMITED,<br><br>Defendants. | : Civil Action No.: 1:-08-cv-00409-BSJ-AJP<br>: ECF Case<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: **DECLARATION OF**<br>: **N. ARI WEISBROT**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**N. ARI WEISBROT,** hereby declares, under penalty of perjury pursuant to 28 U.S.C. §1746, as follows:

1.    I am a member of the firm of Phillips Nizer LLP, attorneys for Plaintiff in the above-captioned matter.

2.    I submit this declaration in opposition to Defendants' Motion to Dismiss the First Amended Complaint.

3.    Plaintiff does not speak English well and does not reside regularly in the United States.  My original (interpreted) conversations with Plaintiff and his family were designed to

extract the minimal information necessary to draft a legally-sufficient pleading.    When faced with Defendants' motion to dismiss, Plaintiff, Plaintiff's family, and Plaintiff's counsel spent more time reviewing the underlying facts and focusing on the time-line demanded by Defendants.

4.    Attached hereto as Exhibit A is a true copy of the minutes of a telephone conference held before United States Magistrate Judge Andrew J. Peck, on April 18, 2008.

5.    Attached hereto as Exhibit B is a print out from the New York State Department of State, Division of Corporations, relating to 263 West 30th, Inc., identifying "Hamid Kermanshah" as its Chairman or Chief Executive Officer.

6.    Attached hereto as Exhibit C is the "Business Certificate for Partners" of Overseas Partnership Company, filed with the Secretary of State of the State of New York, signed by Hamid Kermanshah.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        May 20, 2008

                                    PHILLIPS NIZER, LLP
                                    Attorneys for Plaintiff
                                    Habibollah Kermanshah

                                    By:_____
                                        N. Ari Weisbrot
                                        666 Fifth Avenue
                                        New York, New York 10103-0084
                                        (212) 977-9700

2

# EXHIBIT A

8524KERC.txt

1

8524KERC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  HABILOLLAH KERMANSHAH,
3
4              Plaintiff,
4
5         v.                        08CV409(AJP)
5
6  ABBAS KERMANSHAH, et al.,
6
7              Defendants.
7
8  ------------------------------x
8
9                                   New York, NY
9                                   May 2, 2008
10                                  2:30 p.m.
10
11 Before:
11
12              HON. ANDREW J. PECK
12
13                                  Magistrate Judge
13
14              APPEARANCES
14              (Via Telephone)
15
15 PHILLIPS NIZER
16      Attorneys for Plaintiff
16 NATHANIEL ARI WEISBROT
17
17 SCHULTE ROTH & ZABEL
18      Attorneys for Defendants
18 ROBERT M. ABRAHAMS
19
20
21
22
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

2

8524KERC
1         (In chambers)
2              MR. ABRAHAMS:  My colleague is with me, but I will be
3  speaking.  I asked for the call because we have an unusual
4  situation that confronts us; we would like the court's guidance
5  on it.  As you know, we filed a motion to dismiss the case,
6  largely on statute of limitations grounds.  The plaintiff
7  responded with a brief opposing on legal and other grounds, but
8  also filed an amended complaint.
9              The amended complaint, essentially in some of the key
10 areas which we based our motion on, reversed course.  So, for
11 example, where the complaint in paragraph 51 says the
12 defendants forwarded stock certificates, bank records, and so
13 forth to the plaintiff.  That practice ground to a halt in the
14 mid 1990s.  Obviously, that's a significant part of the basis
                    Page 1

8524KERC.txt

```
15    for our motion.  In the amended complaint, those words were
16    changed materially.  So it now says, at one time information
17    was forwarded but that practice ebbed in the mid 1990s;
18    nevertheless, the practice of updating plaintiff as to these
19    businesses continued, I am editing, continued to as recently as
20    late 2006.
21          There were other changes of like ilk throughout the
22    amended complaint.  Frankly, I have never seen something like
23    that before.  I looked at the law on this.  I could only fine a
24    couple of cases, one in the Eastern District and one in the
25    Southern District.  The one in the Eastern District which was a
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

                                                                    3

8524KERC

```
1     decision by Judge Johnson, a case called Wallace, where Judge
2     Johnson said, well, when you have filed an amended complaint
3     after a motion to dismiss that directly contradicts what was
4     there before, I am going to look at the original complaint.
5           The other decision which is by Judge Batts says, well,
6     that was a case where you had that sequence, where you had the
7     motion to dismiss and then an amended complaint.  In the case
8     that she had before her which is called Barris, she came to the
9     other conclusion, which is that she would deal with the amended
10    complaint, and then she wound up dismissing the case anyway.
11          So, that's all we have been able to find on the law in
12    this area.  I am calling because you had set up a schedule
13    under the circumstances, it's little difficult to figure out
14    how to deal with it.  I have a suggestion which I put to Mr.
15    weisbrot before we got on the phone; I don't know how he feels
16    about it.  We put in a brief.  He put in a brief.  I would
17    suggest that we put in a brief in a week that deals both as a
18    reply brief and addresses the allegations in the amended
19    complatin, and then Mr. Weisbrot should have an opportunity to
20    respond to that, because obviously we would be raising stuff
21    that had not been raised before.  I think that's the right way
22    to deal with it.  That's the reason for the call today.
23          THE COURT:  Mr. Weisbrot.
24          MR. WEISBROT:  Thanks.  I actually was not going to
25    make any comments in this conversation because I didn't realize
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

                                                                    4

8524KERC

```
1     we were going to be on the record.  Since we are making a
2     record, I want to respond to a couple of things.
3           THE COURT:  Everything Mr. Abrahams says you believe
4     is wrong.  Now having said that on your behalf, let's cut to
5     the chase.
6           MR. WEISBROT:  I have nothing to add then.  You know
7     him a lot longer than I do; so whatever you decide is fine with
8     me.
9           THE COURT:  It has nothing to do with knowing him.
10          MR. WEISBROT:  You didn't cut him off.
11          THE COURT:  That's true and if you need to make a
12    record, you can.  All I was saying is now that I understand
13    what the issues are, I of course expect opposing counsel to
14    disagree on any substantive points.  what we are really talking
15    about is briefing and scheduling and the best way procedurally
16    to handle this.
17          I will also say that to a certain extent, I am not
18    sympathetic with all due respect to Mr. Abrahams, because when
19    we discussed the forthcoming motion to dismiss at the March 13
```

                          Page 2

8524KERC.txt
20  conference, and you, Mr. Weisbrot, said you were going to amend
21  anyway or that you might amend, whatever it was, I suggested
22  that we let you amend first then do a motion as to the amended
23  complaint, Mr. Abrahams thought that that was the wrong way to
24  go.  That might have made the briefing on this easier and
25  shorter and more clearly presented the issues to the court.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    5
8524KERC
 1          Indeed, I almost wonder whether the better way,
 2  particularly since much of it is word processing which through
 3  the magics of computers can be easily juggled, whether it
 4  wouldn't make sense to withdraw the existing motion and have a
 5  new motion aimed at the amended complaint.
 6          MR. ABRAHAMS:  I was wrong, OK, but then again I did
 7  not expect this sort of a pleading.  If you think, judge, the
 8  better way to go is to simply start from scratch, we file, I am
 9  amenable to that.  I don't think it will take quite as long as
10  it did before we already briefed the central issues.
11          THE COURT:  The question I would ask both you and
12  Mr. Weisbrot, I have skimmed the two briefs that have come in,
13  so you are all already causing me, somebody is causing me more
14  work than I would otherwise like.  If you think that with two
15  more briefs, one from each of you, one can firmly focus what
16  issues are still to be decided by the court from the earlier
17  brief and what issues are not because they have been mooted or
18  changed in a 90 degree angle or a 45 degree angle by the new
19  amended complaint, that's fine.
20          I actually think it might be cleaner, but I am not
21  doing it just to punish you all, I think it might be cleaner to
22  withdraw the current motion and have a new motion with as much
23  cut and paste from the old briefs into the new as may be
24  appropriate.  I don't want to cause either of your clients more
25  money than is justified.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    6
8524KERC
 1          MR. ABRAHAMS:  I don't think it makes much difference.
 2  I thought it was easier the way I suggested, but I am perfectly
 3  happy to do it the way you suggest, judge.
 4          THE COURT:  Mr. Weisbrot, any thoughts as between
 5  those two alternatives or any otherwise.
 6          MR. WEISBROT:  No.
 7          THE COURT:  OK.  Let's get a new motion in then.  What
 8  schedule would you both like on that.
 9          MR. ABRAHAMS:  How is the 14th for our motion.
10          THE COURT:  OK.  Mr. Weisbrot.
11          MR. WEISBROT:  Judge, I have to be very honest.  I
12  have a real problem.  I will only take a week even though I
13  probably need 30 days.  What you didn't let me say before is
14  that this whole thing is designed to delay answering the
15  complaint as long as possible so that the subject matter of
16  what's going on here can be, let's call it, diverted and
17  misappropriated.  I can prove everything I am saying right now.
18          All that's going on here, in case the court has not
19  realized it yet, it will when I do finally get a chance to be
20  heard, the defendants are putting as much emphasis as they can
21  prepleading on legal fees charging my clients whom they have
22  taken millions of dollars from, it's all in our papers, we have
23  proven it, all they are trying to do is increase, now it's a
24  second prepleading motion to dismiss now after Mr. Abrahams was
                                  Page 3

8524KERC.txt
25  told not to file the first one, we are going to be answering a
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              7

    8524KERC
1   second one.  It's going to be four months before we get an
2   answer, assuming the motion is denied.
3           By that time whatever was left is going to be gone.
4   It's all a big ploy, and unfortunately because I understand how
5   the system works, there is probably very little I can do to
6   prevent it, except to ask for an opportunity after the motion
7   is decided to stop the proceeding and file a Rule 11 sanctions
8   motion.  It's undisputed that Mr. Abrahams in his first motion
9   wrote something in his first paragraph that I have proven
10  false.  It is a knowing falsity.  I am not saying Mr. Abrahams
11  knows it's false.  Now he does.  I would like to see if he
12  corrects it in the amended papers.  He did it two seconds ago.
13          There is nothing inconsistent between the two things
14  he just read.  He gave us stock certificates, his clients, in
15  the '70s and '90s, then he stopped giving us them afterwards.
16  The first time we didn't say he stopped giving them because we
17  thought everyone would understand that by their nature you get
18  them, then if there is no more issued, you don't give them
19  anymore.  That's not something that happens every day.
20          The defendant gave us stock certificates in the '70s
21  and '80s and that was the end.  He never gave us anymore.  That
22  doesn't mean anything.  So when we write for Mr. Abrahams'
23  benefit that he stopped after the '90s, there were no more
24  stock certificates, we clarified that by saying, you don't give
25  it, there was no more stock issued.  Things like purchase
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              8

    8524KERC
1   documents, deeds, you only get a deed once, and we happen to
2   have gotten them in the '70s and '80s.  We never knew -- it's a
3   scam.  I am surprised that he is going to do it again because
4   it just completely sheds light on what's going on here.
5           It's frustrating.  So I will ask for a week so we can
6   move this along.  I will put myself in an unbelievable
7   disadvantage so my clients don't have to keep saying how are
8   they able to do this.
9           THE COURT:  First of all, I am not sure which briefing
10  takes longer or shorter, but when I asked whether the reply and
11  surreply, so to speak, proposal made more sense or starting
12  from scratch, you took no position.  I take it you are now
13  saying that the latter might be more cost-effective, or the
14  former, whatever, the reply and surreply approach might be more
15  cost-effective and less burdensome to you as a lawyer and your
16  client economically.  If you want to go that route, I am
17  willing to go that route.
18          MR. WEISBROT:  Either case, I am submitting one more
19  brief, so it doesn't really matter in terms of cost; the cost
20  is going to be the same.  I am worrying now about the time.
21  Either way, I don't care; I just want it moved up a little bit.
22  Mr. Abrahams has a huge law firm.  I have already spoken to two
23  or three associates on this case.  What does he need two more
24  weeks for this for.  He can't put in papers tomorrow, Tuesday
25  Wednesday.  Let him put it in in a week; let me put it in a
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              9

    8524KERC
                         Page 4

```
                            8524KERC.txt
1    week afterward.
2            MR. ABRAHAMS:  I am not going to respond to the
3    statements.
4            THE COURT:  Good.  Can you shorten the time for
5    whatever your next brief is going to be .
6            MR. ABRAHAMS:  If all I am doing is putting in, as you
7    put it, a sort of reply and surreply, I can do it a week from
8    Monday.
9            THE COURT:  A week from Monday is the 12th, doing a
10   whole new whole brief is the 14th.
11           MR. ABRAHAMS:  Just a little more work involved.
12           THE COURT:  Let's leave it where it is.  New motion to
13   dismiss is due May 14.  Plaintiff's opposition is due, you
14   really want only a week.
15           MR. WEISBROT:  That's it, judge.
16           THE COURT:  May 21.  Defendants' reply.
17           MR. ABRAHAMS:  One week.
18           THE COURT:  Due May 28.  You even lose a day due to
19   Memorial Day, but your associates will probably be working that
20   day, so you don't really lose anything.  Sorry, I couldn't
21   resist that; it's unfair but you will live with it.
22           MR. ABRAHAMS:  That's fine.  I just want to be clear
23   that I will not comment on Mr. Weisbrot's comments.
24           THE COURT:  That's good.  Don't take longer not
25   commenting than you would commenting.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                10
     8524KERC
1            MR. ABRAHAMS:  I will put them in the papers.
2            THE COURT:  As to any Rule 11 issues, you don't need
3    my permission, follow what Rule 11 says.  Let's hope we are not
4    going there.  That just tends to increase costs.  Whatever you
5    all think you have to do, you have to do.  Also with respect to
6    the day of reckoning issue, whatever, I will remind both sides
7    that the reason discovery was stayed was because at the March
8    13 conference you both agreed that that made the most sense and
9    that was a major reason that the court agreed to stay
10   discovery.
11           MR. ABRAHAMS:  Understood.
12           THE COURT:  I guess that is it.  Make sure you all
13   send me courtesy copies at the time your papers come in and I
14   guess, Mr. Abrahams, it again may not be fair, but since this
15   was your conference, why don't you buy a transcript and give a
16   free copy to the plaintiff.
17           MR. ABRAHAMS:  Will do, your Honor.
18           THE COURT:  Anything else.
19           MR. WEISBROT:  That's it.
20           MR. ABRAHAMS:  Thank you.
21           THE COURT:  Thank you.
22                                   -   -   -
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300


                             Page 5
```

# EXHIBIT B

57, 5TH AVENUE
NEW YORK, NEW YORK, 10003

**Chairman or Chief Executive Officer**

HAMID KERMANSHAH
57, 5TH AVENUE
NEW YORK, NEW YORK, 10003

**Principal Executive Office**

263 WEST 30TH INC.
57, 5TH AVENUE
NEW YORK, NEW YORK, 10003

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results           New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

http://appsext8.dos.state.ny.us/corp public/CORPSEARCH.ENTITY INFORMATION?...    12/15/2007

# EXHIBIT C

# Business Certificate for Partners

The undersigned do hereby certify that they are conducting or transacting business as members of a partnership under the name or designation of **OVERSEAS PARTNERSHIP COMPANY**

**c/o Habibollah Kermanshah, 245 Fifth Avenue, New York**

in the County of    New York      , State of New York, and do further certify that the full names of all the persons conducting or transacting such partnership including the full names of all the partners with the residence address of each such person, and the age of any who may be infants, are as follows:

**NAME** Specify which are infants and state ages.                 **RESIDENCE**

Abdolhamid Kermanshah.         305 East 24th Street, New York 10010

Habibollah Kermanshah.         305 East 24th Street, New York 10010

Abbas Kermanshah           305 East 24th Street, New York 10010

WE DO FURTHER CERTIFY that we are the successors in interest to

the persons ~~or persons~~ heretofore ~~using the~~ such name ~~to carry on or~~ conduct or transact business.

**In Witness Whereof,** We have made                                      19 85  made
and signed this certificate.

**ABDOLHAMID KERMANSHAH**

**HABIBOLLAH KERMANSHAH**

**ABBAS KERMANSHAH**

---

State of New York, County of  NEW YORK          ss.:          INDIVIDUAL ACKNOWLEDGMENT

On this    23rd     day of    May        19 85 , before me personally appeared
Abdolhamid Kermanshah, Habibollah Kermanshah and Abbas Kermanshah
to me known and known to me to be the individual    described in and who executed the foregoing
certificate, and  t hey thereupon        duly acknowledged to me that t hey executed the same.

HARRIET ARONOW
Notary Public, State of New York
No. 41-4760467
Qualified in Queens County
Commission Expires March 30, 19 87

State of New York, County of                                    ss.:                    CORPORATE ACKNOWLEDGMENT

On this _____ day of _____ 19___, before me personally appeared

|   |   |   |   |
|---|---|---|---|
| B |   | 25.00 | BUSN |
| B | 2ø | 8.00 | CERT |
| I |   | 33.00 | TOTL |
|   |   | 33.00 | CKTD |

to me known, who being by me duly sworn, did depose and say, that ___ he resides in

that ___ he is the _____ of

|      |     |         |
|------|-----|---------|
| 5589 | 109 | 5/23/85 |
|      |     | .00 CACU |
| 5589 | 109 | 5/23/85 |

the corporation described in and which executed the foregoing certificate; that ___ he knows the seal of said corporation; that the seal affixed to said certificate is such corporate seal; that it was so affixed by order of the Board of _____ of said corporation, and that ___ he signed h___ name thereto by like order.

**Certificate of Partners**

INDEX NO.  004255

MAY 23 '85

CERTIFIED COPY ISSUE
FEB 23 1985
Delivered County Clerk, N.Y. Co.
County Clerk, N.Y.

CONDUCTING BUSINESS UNDER THE NAME OF

**OVERSEAS PARTNERSHIP COMPANY**

PRINT YOUR NAME
STARK Elman Amron
Roseo
PRINT YOUR BUSINESS ADDRESS
1133 6ᵗʰ AVE. 10036
PRINT YOUR BUSINESS TELEPHONE NUMBER
354-0600

State of New York, County of                                    ss.:                    INDIVIDUAL ACKNOWLEDGMENT

On this ( 1 ) 19___, before me personally appeared

DEC 27 1988
Delivered County Clerk, N.Y. Co.
County Clerk, N.Y.

to me known and known to me to be the individual ___ described in, and who executed the foregoing certificate, and ___ he thereupon duly acknowledged to me that ___ he executed the same.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HABIBOLLAH KERMANSHAH,<br><br>Plaintiff,<br><br>v.<br><br>ABBAS KERMANSHAH, ABDOLMAJID KERMANSHAH, a/k/a MAJID KERMANSHAH, ABDOLHAMID KERMANSHAH, a/k/a HAMID KERMANSHAH, 263 WEST 30TH INC., BANAFSH REALTY, INC., EBRAHIM REALTY, INC., KERMANSHAH BROTHERS ORIENTAL RUGS, INC., KERMANSHAH ORIENTAL RUGS, INC., KERMANSHAH BROTHERS RUGS, INC., OVERSEAS PARTNERSHIP CO., INC.,  OVERSEAS PARTNERSHIP COMPANY, RAHMAN NY, INC., SHERIN WEST 86TH STREET CORP., SHIREWIL, INC., and WILSHIRE LIMITED,<br><br>Defendants. | CIVIL ACTION NO.: 1:08-cv-00409-BSJ-AJP<br><br><br><br><br>**DECLARATION OF HABIBOLLAH KERMANSHAH** |

**HABIBOLLAH KERMANSHAH,** declares under penalty of perjury that the following statements are true and correct:

1       I am the Plaintiff in this action and I am fully familiar with the facts set forth herein. I respectfully submit this Declaration in opposition to Defendants' Motion to Dismiss the First Amended Complaint.

2       On October 31, 2000, after the economy began a steady downturn, me and my  brothers determined not to expand our businesses or acquire any additional property for the foreseeable future and,

1044979.1

therefore, to the extent it was no longer necessary, I sent a revocation of Power of Attorney to the Defendants, which was personally delivered to the Defendants on October 31, 2000 by Arc Messengers. (A true copy of the Revocation of the Power of Attorney is attached hereto as Exhibit A).

3    As I learned in 2007, three (3) months after the revocation was delivered to my brothers, they knowingly used the revoked power of attorney to steal the Monroe Street property.

HABIBOLLAH KERMANSHAH

Dated: May 21, 2008

# EXHIBIT A

To:  Abbass Kermanshah
     Abdol Majid Kermanshah
     Abdol Hamid Kermanshah
     c/o Kermanshah Oriental Rugs
     57 Fifth Avenue
     New York, NY 10003


## REVOCATION OF POWER OF ATTORNEY

I, Habibollah Kermanshah, residing at 100 Winston Drive

South, Apt. 11A Cliffside Park, NJ 07010, hereby revoke effective

Immediately, any and all Power(s) of Attorney whether specific,

limited or general under which Abbass Kermanshah or Abdol Hamid

Kermanshah or Abdol Majid Kermanshah individually or collectively

was (were) appointed in the past to act on my behalf in any

capacity for any reason.


Dated:  October 31, 2000

_____
Habibollah Kermanshah


This instrument was acknowledged before me on this 31st day of

October 2000.    3 COPIES BEING DELIVERED TO THE ABOVE MENTIONED PERSONS.

OCT. 31 2000

JASON ROMAN
ABC MESSENGERS
5912-7831

Notary Public

_____ Notary Public

Title (and Rank)
My commission expires 11/01

Ernestine Brennan
Notary Public State of New York
No. 01BR6032602 Qualified in New York County
Certificate Filed in New York County
Commission Expires 11/01/2001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HABIBOLLAH KERMANSHAH, | : Civil Action No.: 1:-08-cv-00409-BSJ-AJP<br>: ECF Case<br>: |
| Plaintiff, | :<br>: |
| v. | :<br>: |
| ABBAS KERMANSHAH, ABDOLMAJID<br>KERMANSHAH, a/k/a MAJID<br>KERMANSHAH, ABDOLHAMID<br>KERMANSHAH, a/k/a HAMID<br>KERMANSHAH, 263 WEST 30TH INC.,<br>BANAFSH REALTY, INC., EBRAHIM<br>REALTY, INC., KERMANSHAH<br>BROTHERS ORIENTAL RUGS, INC.,<br>KERMANSHAH ORIENTAL RUGS, INC.,<br>KERMANSHAH BROTHERS RUGS, INC.,<br>OVERSEAS PARTNERSHIP CO., INC.,<br>OVERSEAS PARTNERSHIP COMPANY,<br>RAHMAN NY, INC., SHERIN WEST 86TH<br>STREET CORP., SHIREWIL, INC., and<br>WILSHIRE LIMITED, | :<br>:<br>:<br>:<br>:<br>:<br>:    **AFFIDAVIT OF SERVICE**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendants. | :<br>: |

N. ARI WEISBROT, an attorney at law, duly admitted to practice law in the State of New York affirms the following statements to be true under the penalties of perjury pursuant to C.P.L. R. 28 U.S.C. §1746: Deponent is not a party to this action; is over 18 years of age and maintains offices in Hackensack, New Jersey.

On May 21, 2008, deponent served by Federal Express, priority overnight mail, a copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, Declaration of N. Ari Weisbrot, and Declaration of Habibillah Kermanshah upon:

1041648.1

Robert M. Abrahams, Esq.
Gregory A. Kasper, Esq.
Schulte Roth & Zabel, LLP
919 Third Avenue
New York, New York 10022
Attorneys for Defendants

_____
N. Ari Weisbrot

Dated:  May 21, 2008

2